Okay, we're ready to go with our third case this morning. It's number 20-11283, Angel Colon v. Twitter, Inc. et al. Mr. Altman. Good morning, your honors. May you please the court. Plaintiff appellants to your senior school district court of defendants of the 2016 attack on the Pulse nightclub by Omar Mateen. Plaintiff alleges that ISIS perpetrated the attack by enlisting the aid of individuals such as Mateen to conduct these attacks. Plaintiff further alleges that defendants provided material support to ISIS, allowing ISIS to conduct terrorist operations. Respectfully, the district court was incorrect in its ruling, essentially requiring that plaintiff was required to show a direct connection between defendants and Mateen. Such a connection is not required. After a brief discussion laying out the foundations of JASTA, the Justice Against Sponsors of Terrorism Act, I will address three points of contention. The Pulse nightclub attack was an act of international terrorism. Plaintiffs have plausibly alleged that ISIS was involved in the attack. Defendants provided material support to ISIS, which is the proximate cause of plaintiff's injuries. Let's talk, Mr. Altman, since we don't have much time. Let's talk about one of the issues, which is your allegations that the defendants provided substantial assistance. Tell me what that substantial assistance consisted of. Your Honor, by allowing ISIS to make use of their social media platforms, they allow ISIS to recruit, to radicalize and to raise money. It's our contention that if not for defendants' social media platforms and their allowance of use, ISIS would be 50 guys in a desert jumping up and down, chanting around a campfire. But the use of social media has allowed them to spread their message across millions and millions of people. But for that, we would not be having this discussion today. We contend the defendants knew that ISIS was using their account, using their systems. We contend that the defendants were aware that ISIS was a terrorist organization. And we contend that defendants knew that ISIS was using their system to conduct terrorist operations. With respect to YouTube, I think you're arguing that YouTube actually cut checks to ISIS, right, for ad revenue? That is also true, Your Honor, by its own terms of service. YouTube shares revenue with those that post videos. We have provided evidence that YouTube posted videos of ISIS with advertising attached. And it's our contention that they share that revenue with ISIS. So here's a question I have in this case, which was, in your reply brief, you say that ISIS knew about this attack beforehand and authorized it. But you don't say that in your complaint. And I just don't understand why you waited until your reply brief in the 11th Circuit Court of Appeals before you made those allegations. What am I supposed to do about that? Well, Your Honor, ISIS claimed the attack. I mean, we didn't have to say that they knew about it beforehand. ISIS claimed the attack. That implies that they were involved in the attack. That is certainly sufficient to raise a plausible inference that they knew about the attack beforehand. So your point is that you think that a reasonable inference from ISIS claiming the attack is that it knew about it beforehand and authorized it. And you're asking us to draw that reasonable inference from the allegations that you make in your complaint. Is that what you're saying? That's what we're saying, Your Honor. Listen, this isn't just a straight thing. The stated purpose of ISIS is to conduct terrorist operations. They seek to reach out outside the sphere of influence because they can't generally come to the United States and to use social media to recruit, radicalize and raise money. So it's reasonable that they had an involvement in this attack. But the fact that they claim that they claimed the attack itself certainly raises a plausible inference that they were involved in planning the attack. But even if they didn't directly plan the attack, they certainly it was their intention to cause people like Omar Mateen through their message to conduct these attacks. I raised the analogy of, you know, the gun in the schoolyard, Your Honor. You know, somebody places a gun in a schoolyard, hoping that some child is going to find the gun and take and cause an attack. It's no problem holding them accountable. Well, in this particular case, our analogy is that the defendants handed the gun to ISIS to put in the schoolyard by allowing them to reach out and find somebody to execute upon their wishes. Now, one of the things the defendants have argued here is that there has to be a direct connection, that somehow the defendants had to have known that Omar Mateen was going to conduct this attack or anything about it. That is simply not true. There are two parts to the process here, and they are separate and distinct. Number one, is there a connection between ISIS and the attack? We have plausibly alleged that Omar Mateen pledged allegiance during the attack to al-Baghdadi and that ISIS claimed responsibility for the attack. Certainly, they weren't going to claim responsibility for the attack before the attack. That would be, you know, that wouldn't be sensible. And so we believe that we have adequately alleged for 12 v. 6 purposes that there is a connection between Mateen and ISIS, whether direct or indirect. That's part one. Part two, did the defendants provide material support to ISIS? And we've adequately contended that, that for a period of years the defendants have used, the ISIS has used defendants' platforms, defendants know about it, and they have allowed it to happen. And essentially, in coming out with JASTA, Congress said that if you help terrorist organizations, we're going to hold you accountable. Even if you don't know exactly what conduct the terrorist organization is going to actually engage in. And that brings up the whole proximate cause argument. Defendants have effectively asserted, you need to show that we directly supported Omar Mateen. And that is simply not required, is not the intention of JASTA. And in doing that, they rely upon fields. But fields came out before JASTA was enacted. So to suggest that fields really stands for this proposition doesn't really, it doesn't really help. If you look at the later cases, you look at Linds, you look at BNP Parbay, they clearly state that you do not have to show that those provided material support knew of the actual attack that was going to happen. What do you say about the argument whether this is international terrorism? Yeah, that's what I was, so what did the Sixth Circuit address that said this wasn't international terrorism? What do you say about that? Well, Your Honor, but by the same reasoning, the September 11th attacks wasn't international terrorism. Took place in the United States. I don't think that is a responsive position because in the September 11th attacks, there were internationals that came to the United States with support from international groups. There was back and forth. There was, you know, even though the attacks happened domestically, the means the statute says transcend national boundaries in terms of the means by which they were accomplished. And I think the September 11th attacks would fit that pretty clearly. How does this this attack fit that as you've alleged it in the complaint? Your Honor's ISIS's stated purpose is to recruit radicalized individuals outside their sphere of influence to go and conduct these attacks. They do this by providing training online. They use defendants platforms to promote their message. That's exactly what they intended to do. They recruit and radicalize outside of their outside of the Middle East into the United States. That certainly crosses national boundaries. There is the fact that they claim responsibility for the attack. So at this time, it is certainly plausible that they had direct connection to the attack. Omar Mateen pledged allegiance to ISIS in conducting the attack. OK, and so that is certainly raises an inference that either directly that that ISIS had a direct connection with Mateen or indirectly that he took up the arms as they suggested that would happen. I mean, look, we've seen, you know, another example of such incidents with the capital tax recently where, you know, there was postings, et cetera, on various tools. Telegram, for example, that promoted individuals to take up arms and to conduct these attacks. And that's exactly what happened. So that's the connection. OK, let me let me just let me address the international issue. Can I just press on the international issue just a little bit? So let's assume that someone in Iran publishes a book and that book is like the equivalent of Mein Kampf or something. It's some kind of some book that that calls on people to attack Americans and suggest that this is a good thing and that Americans should be taxed. And then the book is published in Iran and then someone in the United States reads that book and they think, you know what, this the author of this book makes a good point. I should attack Americans. And then that person does that. Is that international terrorism? Because the book was published in Iran. No, I think that's very different than the situation. How is that different? I know I think that's very different than what we have here, because the stated purpose of ISIS is to come directly into the United States and call for specific attacks. They do this by a massive campaign using social media, doing broadcasts, doing, you know, sending messages, connecting with people, promoting violent, promoting violent acts. I think it goes way beyond what that is. And plus, ISIS is a foreign designated terrorist organization, which is something different than just somebody who writes a book. And it might be that if a foreign designated terrorist organization wrote a book and used it in that capacity, it might constitute international terrorism. But I think on that fact, it's too sparse. But here it is. And it calls to actively and massively promote calls to violence and calls to action. It is not unheard of. I mean, you know, it's it's the classic you tell you, you know, you incite people to riot. You can be held accountable for that. So why is that different here? Yeah, well, so you're not suing ISIS. Yes, but the short period of time that I have left. Well, I think I think Judge Jordan will let you go over. So let me let me ask you another. Can I ask you another question about. So let's let's talk about like the 1960s and whether other whether underground. Here's another hypo for you. So whether underground protests, the Vietnam War, they they blow up some bombs and stuff like that. They do that specifically because they're trying to get the United States to change its foreign policy in relation to Vietnam. And they do it in part because they're inspired by Vietnamese communism. Is that international terrorism or domestic terrorism? What whether underground did assuming is terrorism. Oh, my. Your Honor, I might have lost that last. I heard they inspired protesting Vietnam and already the call dropped off. Yeah. So my hypo was I don't know whether you're familiar with whether underground, but whether underground was an organization that protested Vietnam by exploding bombs. And it did so because it was trying to get United States foreign policy with respect to Vietnam change. And it did so in part because it was inspired by the communists in Vietnam. Is whether underground domestic or international terrorism. I think that's different. I think that's probably domestic terrorism because you didn't have an organization from outside the United States actively, actively calling for that kind of that kind of attack. I think that's the distinction here. The stated purpose, the stated purpose of ISIS is to call for these kinds of attacks. So I think that I think that is the distinction. Anybody else have any more questions for Mr. Altman at this time? OK, Mr. Altman, thank you very much. You've saved your your full time for rebuttal. Thank you, Your Honor. Ms. White. Thank you, Your Honor. Good morning. Lauren White, counsel for Google, arguing on behalf of the three defendant appellees, Google, Facebook and Twitter. There is no legal basis to hold defendants responsible for Omar Mateen's attack at the Pulse nightclub in Orlando. And an unbroken line of more than a dozen cases from more than 20 judges around the country clearly and directly supports the district court's dismissal here. In particular, as reflected in Judge Mendoza's order, the Sixth Circuit's unanimous decision in Crosby affirmed the dismissal of what is essentially the exact same case. Crosby was brought by the same counsel. It involved identical claims against the same defendants and was based on essentially facts and theories to those. Can I ask you one question on that point? And it may or may not make a difference legally. But I thought that the Sixth Circuit said in its opinion that there was no indication that ISIS had been involved in the shooting at Pulse. Whereas this complaint, again, whatever its legal effect, says that ISIS claimed responsibility after the fact and sort of praised Mr. Muteen for what he had done. That's different than the complaint that issue in Crosby, right? No, that's not right. The Crosby complaint also alleged that ISIS had claimed credit for Omar Muteen's shooting after the fact. But the Crosby court found that that after the fact claim of credit was not sufficient to find that ISIS had authorized the attack or committed the attack. Why is that? Why is that correct as a matter of 12B6 law? I mean, if an organization after the fact takes responsibility for something, why can't you draw a plausible inference that it was really involved with the event at issue? Well, two points are most important here. First, in 730 paragraphs of the Third Amendment complaint, there is not one allegation other than the claim of credit after the fact connecting ISIS to Omar Muteen or his shooting. And second, in particular, looking at the section of the Third Amendment complaint titled ISIS's June 12, 2016 Orlando attack that appears paragraphs 410 to 479, there are no allegations about any involvement by ISIS in Omar Muteen's shooting. That doesn't answer the question. The question is, why is an organization's after the fact assertion of involvement not enough to plausibly infer that the organization was in fact involved at the outset? So the Third Amendment complaint actually at paragraph 427 footnote 57 cites an article which references an FBI report finding that ISIS had no prior communication or participation in the attack. Now, to authorize means to give official permission for and to commit means to carry out or perpetrate. And I know my friend on the other side began his argument by saying that ISIS perpetrated this attack, but that is not alleged anywhere. And in fact, it is contradicted by sources cited within the Third Amendment complaint itself. And furthermore, as the district court recognized, the complaint repeatedly alleges that Omar Muteen was self-radicalized and as the district court found that the definition of that term implies that there was no actual connection or coordination between Omar Muteen, the actual perpetrator, the person who committed the attack, and ISIS. So the plain meanings of the term authorize and commit, along with the allegations that actually contradict any claim of participation by ISIS together, negate any inference, much less a plausible inference that ISIS had something to do with actually planning, authorizing, or committing this attack. Let me ask you a hypothetical. So let's say that ISIS developed some kind of, let's call it like the death ray, the death ray one, and they shoot the death ray from Iraq into Florida and they kill people. I guess you would agree that that is an act of international terrorism. I would agree. So let's say that they use death ray two, which death ray two doesn't kill people, it just hypnotizes people into killing people. So they shoot death ray two into Florida. It hypnotizes people. And then they go around, they kill everybody, you know, in their immediate vicinity and then kill themselves. Is that an act of international terrorism? I think if there was an allegation that some weapon or device directly connected ISIS to a perpetrator in the United States, that probably would be enough. So they shoot death ray two. So death ray two is international terrorism. And so obviously, why isn't this like death ray three, right? Why didn't what they do shoot their propaganda into Florida and by doing that, basically manipulate this guy into killing all these people in a nightclub and then himself? And so why isn't that an act of international terrorism? Well, the question of whether Omar Mateen's shooting was an act of international terrorism is simply one of three separate specific statutory elements, all of which have to be met in order for the court to find that Omar, that defendants could be liable for aiding and abetting. Well, I guess my point is not so. I mean, you said Omar Mateen. I mean, why isn't what ISIS did, which is distribute this propaganda through the Internet to to basically brainwash someone in Florida to kill people in Florida? Why isn't that an act of international terrorism? Oh, so the term international terrorism in the statute is defined section 2331 as an act which is carried out primarily overseas or that transcends national boundaries and the means by which it was carried out as your honor recognized. My friend on the other side and and the the what's important to remember here is the structure of the statute and the legislative history. So the term domestic terrorism is separately defined in subparagraph five of Section 2331 as acts that occur primarily within the United States, which this clearly was Omar Mateen is a U.S. So there was no actual outside help or communication from anyone outside the United States. So that's the first point. And second, as we explained in our brief, the expansion of the ATA to cover civil claims for acts of international terrorism was intended to close a jurisdictional gap for parties who may not have a civil remedy or acts that may occur over on high seas or in the air. Or in places outside the territory bounce outside the jurisdictional scope. The United States clearly not an issue here as plaintiff state law claims clear. So so to the extent that there is any ambiguity in the definition of the term international terrorism, which I don't agree that there is the structure and the purpose and the legislative history of that term make clear that it was not intended to apply to circumstances like these. But think about this white, the causation issue with potential aiding and abetting liability. What does that mean? Is it exactly like that of the D.C. circuit in what Congress suggested, or is it closer to criminal aiding and abetting liability? So in enacting Section 2333 D, Congress specifically referenced the D.C. Circuit's decision in Halberstam versus Welsh and also used the traditional common law term knowing and substantial assistance in the actual enacted codified text of that provision. So I don't think there's any dispute that that language requires common law, civil aiding and abetting liability. And as explained in Halberstam, that requires three elements of an injury derived from the principal act of violence that that issue is not reasonably in dispute here. Second, that the defendant, the alleged aider and abetter, be generally aware that by providing assistance in the course of providing assistance is playing a role in an underlying criminal course of conduct. And third, that the assistance be knowing and substantial. And those second two elements are critical here. And there is no allegation that defendants were generally aware that by operating their global communication services, which are accessed by billions of people around the world, that in operating those services at any point, they were somehow participating in a criminal course of conduct. And actually, the Third Amendment completely cedes that all three defendants have rules that specifically prohibit the type of activity and content underlying plaintiff's claim of assistance here. How tight does the knowledge and foreseeability have to be? In other words, if in a hypothetical scenario, if one of these companies is allowing a group like ISIS to use its platforms all the time and knows that this sort of organization works on getting people to radicalize. What inference can be drawn from the possibility that someone may actually take these messages to heart and do something horrible with them? So there's two problems here, Your Honor. And the first is there are no allegations, no plausible allegations that any one of the defendants provided assistance, whether in the form of allegedly failing to remove content or otherwise, to a user or an account that the defendant knew to be associated with ISIS in any way. 730 paragraphs of the complaint. There is no allegation that comes close to that. But second, even if that were not the case, there are no plausible allegations that ISIS was the person who committed Omar Mateen's shooting. And that failure alone dooms any aiding and abetting claim. What about the allegation? I mean, the one that was most troubling to me, well, there was a lot that was troubling to me. One was the Facebook memo that says we're going to continue to connect people even if they commit terrorism. That's a problem. The other is the allegation that YouTube just wrote checks to ISIS because of the ad revenue on YouTube. What do you say about that as far as aiding and abetting? There is no actual plausible allegation that YouTube paid any money to ISIS. Again, in this voluminous complaint, there is a single paragraph that vaguely refers to a known ISIS account and alleges that in connection with a single video under YouTube's normal policies for ad revenue sharing, there theoretically could have been ad revenue shared with the user who posted the account. Now, I don't know what known ISIS account means, but it is certainly not an actual allegation, much less a plausible allegation that YouTube knew that the user who posted that video was associated with ISIS. Well, I thought that there were, doesn't YouTube say that it reviews the videos before it puts ads on the videos? I thought that was part of YouTube's policy. YouTube's policies require that videos uploaded to its service and monetized comply with its policies. That's correct. Right, so if there was a video on YouTube of ISIS fighters running around, then YouTube monetized it, then YouTube knew that it was a video of ISIS fighters running around and then monetized it anyway and then sent a check to ISIS. I think, I mean, those are the allegations in the complaint. Well, a video of ISIS fighters running around would not necessarily indicate that the video was posted by a user who was associated with ISIS, but again, the allegations in that single paragraph of the complaint. The pictures in the complaint are of ISIS fighters. They've got people in cages. They've got people they're about to behead. So, the pictures in the complaint are not sufficient from the, these are clips from the video that was posted to YouTube. I mean, I'm just talking about this because you seem to think that this is not a problem. Why is this not a problem? This is not a problem for any of the claims that are at issue in this appeal. So, your position then is if ISIS posted videos to YouTube, they were clearly ISIS videos, there were people being beheaded, and YouTube monetized those videos and sent checks to ISIS, that that would not be substantial assistance under this statute. Is that your position? That is not what is alleged here, but yes, substantial assistance has a clear definition under the decision in Halberstam, which requires that the plaintiff allege that the amount of assistance given reflect that the defendant, the alleged aider and abettor, provide significant assistance that essentially shows that the defendant was one in spirit with or acted as the back end operation of the actual attack. And Halberstam also makes clear that the assistance has to be connected to the principal violation. So, even assuming that there was some support in the form of hosting content or money that does not show any connection whatsoever to the attack, it's certainly not where there's furthermore no connection between ISIS and Omar Mateen. And in fact, allegations that rebut any connection between Omar Mateen. So again, there are no plausible allegations that YouTube shared any money with any user who could have any connection with or affiliation with ISIS. But accepting the premise and the hypothetical, that would not be enough to show substantial assistance under the definition of knowing and substantial assistance set forth in Halberstam. And it would not be enough to show that YouTube or any of the defendants provided assistance or aided and abetted the actual attack underlying and causing plaintiffs. So I see I'm over my time. Unless you're honored to have further questions. I will admit. All right. Thank you very much. Mr. Thank you. Just to point out a couple of things to clear up something my friends said she talked about the self radicalized sentence that really was very misleading what was said because number one it's paragraph 469 of the complaint. It is not our allegation is a quote from FBI director, who says the government was self radicalized through the Internet. So, it's not just simply that it was self radicalized by itself the way that they would take it so that really was a misquote. And it's a quote from the FBI director. That's not necessarily the end all and be all fact that address some of the things that they raised. Let me ask you about one thing so that you can answer it during the time you have left. Miss White says that you can't consider your allegation that ISIS claimed after the fact responsibility in a vacuum because somewhere in a footnote in the complaint. You also site with a parent approval on FBI report that said that ISIS had no before the fact knowledge or approval or authorization of the shooting. We first is she correct about that? And if so, how do you square those two allegations in the complaint? She is not correct and she's talking about the self radicalized statement, but it says self radicalized through the Internet. No, no, I'm not talking about. I'm not asking about Mr routine. I'm asking about. Isis is knowledge ahead of time. You, you, you argue in part Mr Altman. I think that by claiming responsibility after the fact that leads to a plausible inference that ISIS was involved before the fact. And Miss White responds in part that there's an allegation in your complaint that also says by citing an FBI report that I says didn't know about this before the fact. So I'm asking you to square those two things for me. Oh, I think I understand what they're saying. They didn't find evidence. You know, they didn't find any direct evidence based on whatever review that they did to show that Isis had any connection to that, but that's a discovery problem. That's not an expense, not necessarily an exhaustive review. That's not that's not. Why would you put that in your complaints? Because I think that's just all part of being fair and balanced in providing the information here that this is what was found by the FBI. I mean, wouldn't that be cherry picking, you know, to just simply sit to just simply say it was an acknowledgement that the FBI did some degree of an investigation. And this is some of the findings that they have, but that does not mean that Isis did not have an involvement in the attack. It just means that that particular question was not resolved that way. But it was very important to me in drafting this complaint. And by the way, one of the things I want to say with the difference between Crosby. Crosby had 200 paragraphs not counting the plaintiffs. Cologne has 570 paragraphs not counting the plaintiffs. There were an additional 370 paragraphs of allegations more than twice the size of Crosby. I mean, all I'm trying to say is that the Crosby complaint, I think Your Honor has recognized that was very different than the complaint that's here today. And that we looked at some of the concerns in Crosby and we we found more information, we put additional information. One of the things that that, you know, just to very quickly go with the Halberstam factors, just to show you, we have met the Halberstam factors. Isis is a terrorist organization. That's unquestioned. Isis depended on defendant's platforms. We've pled that. Defendants knew that Isis was using their platforms and they can't say that they don't because they take steps, successful or otherwise, to take terrorist content down. And one of the, may I have an extra minute, Your Honor? Yes, of course. Okay, thank you so much. If you, one of the very key examples that was very disturbing that we found in real time, if you look in the complaint, the example of Drift1147, this was an individual who had like 12 tweets and 300 followers, which is unexpected. And I'm paraphrasing the numbers a bit. They took him down, the next day he's back with a couple of tweets and the same number of followers. They take him down and a couple of days later, he's back up again, he's Drift1151. Okay, so they can't say that they don't know that these people, and by the way, he then puts a posting, Dhaka, Bangladesh, three days before the Dhaka, Bangladesh terrorist attack. And then uses them afterwards for conducting the attack. The point is, is that going through the Halberstam factors, the defendants allowed Isis to use their platforms. Remember something, Your Honors, there can't be a secret candidate here. In order for people to become radicalized and recruited, they have to be able to find the content. This is not the deep dark web where people are communicating surreptitiously. If the content isn't there and available to be found, these new people are not going to find it. So the defendants can't say they don't know it's a secret. And Isis has been using their platform for years. Okay, this is not something that the defendants don't know. And Judge Brasher, in your example, I mean, I think my friend conceded the point that reaching out into Florida as Isis has done intentionally and causing individuals to take up actions on their behalf is certainly your death rate too example. I think that was a great way to put it. Thank you, Your Honors, very much for your time. Thank you both. We appreciate it. Thank you.